FILED 21 JUN '11 15:29 USDC-ORE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| CAROLYN McCANN, | ) |
| | ) |
| Plaintiff, | )  Civil No. 10-6091-HO |
| | ) |
| | ) |
| v. | )  ORDER |
| | ) |
| CITY OF EUGENE, a municipal | ) |
| corporation, by and through its FIRE | ) |
| AND EMS DEPARTMENT; Fire Chief | ) |
| RANDALL GROVES; and Operations Chief | ) |
| KAREN BRACK, in their official and | ) |
| individual capacities, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff, Carolyn McCann, brings this action alleging
discrimination on the basis of disability and/or perceived
disability and based on gender. Plaintiff also alleges
discrimination and retaliation as a result of invoking worker's
compensation rights.

Plaintiff began work as a firefighter and EMT with the City of Eugene Fire Department in 1998. On or about December 2, 2006, plaintiff experienced a cardiac event that resulted in her heart stopping and a loss of consciousness. Plaintiff experienced further cardiac issues at work on December 7, 2006, and consequently took medical leave. Plaintiff returned to light duty work on March 7, 2007, consistent with restrictions imposed by her treating cardiologist, Dr. Ramakota Reddy.

Plaintiff's doctors informed her that her condition may have derived from a virus she contracted at work resulting in echo viral myocarditis. Consequently, plaintiff filed a workers' compensation claim. On June 11, 2007, the City denied the claim citing insufficient evidence of a work-related cause. A subsequent appeal of the decision resulted in a months-long process eventually resulted in approval of the claim.[1]

Ultimately, Dr. Reddy concluded that plaintiff had some form of autonomic dysfunction that makes her heart rate slower than is physiologically appropriate for her. After more than a year of trying to control the condition with medication, plaintiff had a pacemaker implanted in April of 2008. The pacemaker successfully relieved plaintiff's symptoms and by June she felt back to normal. On June 8, 2008, Dr. Reddy provided a release in which he stated plaintiff

---

[1]The City is appealing the approval.

is now about 2 months post pacemaker implantation with
good healing and normal pacemaker function. She does not
require any limitations in her activities at this point
from a pacemaker perspective and may resume all normal
activities, both in recreation and occupation.

Ex. 11 attached Declaration of Jennifer Middleton (#31).

However, plaintiff needed to rebuild her strength and thus on
May 15, 2008, told her Operations Chief, Karen Brack, that she and
her cardiologist expected a return to full duty in September of
2008. Even though the City expected a return to full duty based on
Dr. Reddy's June 8 assessment, plaintiff was not ready and by her
own assessment was not ready until sometime in August of 2008.
Accordingly, plaintiff asserted that she would not be ready for a
full return until September.

Because of plaintiff's assertion that she was not ready for a
full return, the City contends it had concerns about the June
release provided by Dr. Reddy. Brack also consulted the National
Fire Protection Association (NFPA) medical standards which noted
that someone who is pacemaker dependent can be at risk for sudden
incapacitation. The City deposed Dr. Reddy in connection with the
workers' compensation proceeding and determined that there could be
issues with radio interference in plaintiff's pacemaker and
concluded that further testing would be required.

On July 24, 2008, the City requested that plaintiff schedule
a treadmill EKG in full gear with the radio running and seek Dr.
Reddy's opinion as to plaintiff's fitness for duty after reviewing

the essential function of her specific job, in light of the City's concerns about physical and environmental challenges to the pacemaker. Plaintiff completed the treadmill test at Dr. Reddy's office on August 1, 2008. Dr. Reddy concluded that plaintiff was fit for work and the City instituted a return-to-duty process for plaintiff. Plaintiff satisfactorily completed the protocols and returned to line work on September 16, 2008, with a different shift where she continues to work.

Plaintiff asserts defendants violated the Americans with Disabilities Act (ADA), the Rehabilitation Act, and ORS § 659A.103 et seq. by requiring the treadmill test, by giving her more burdensome work, and by giving her an unfavorable shift assignment. Plaintiff also alleges violation of 42 U.S.C. § 1983, asserting denial of equal protection. Plaintiff also alleges gender discrimination in violation of Title VII and ORS § 659A.030. Finally, plaintiff alleges worker's compensation retaliation in violation of ORS § 659A.040. Plaintiff moves for summary judgment as to her ADA, Rehabilitation Act, and ORS § 659A.103 claims, asserting the treadmill test did not serve any legitimate business reason, but instead was based on unwarranted speculation and fear that her pacemaker presented a safety risk. Defendants move for summary judgment as to all claims.

4 - ORDER

Plaintiff's Motion for Partial Summary Judgment (#29)

Both parties rely extensively on Dr. Reddy's testimony to establish their respective cases regarding the treadmill test.

As noted above, Dr. Reddy provided a release to resume all normal activities both in occupation and recreation on June 6, 2008. While plaintiff asserts that the plan all along was for her to rebuild her strength and target her return to full duty sometime in September, it is not unreasonable for a trier of fact to conclude that plaintiff's need to put off full duty until September called into question the release as it pertained to work as a firefighter. The deposition of Dr. Reddy also could permit a trier of fact to conclude that testing was reasonable.

The City did consult outside counsel, in light of the request for a September return, who opined that without reason to doubt Dr. Reddy's June release, there was no need for the exam. Exhibit 17 attached to Declaration of Middleton (#31) at p. 1. However, counsel also noted that the City has a legitimate need to ensure that the physician who released plaintiff understands the equipment and environment plaintiff will use and work in to address concerns about the functioning of the pacemaker. Id. at pp. 1-2.

The City's contracted occupational health physician, Dr. Richard Abraham, expressed concern about abrasion at the pacemaker site from firefighter turnouts, but did not think it would preclude plaintiff from performing the essential functions of her job.

5 - ORDER

Abraham Deposition at pp. 25-26 (attached to Declaration of
Middleton (#31)). Abraham also noted interference issues, but that
he would have to rely on Dr. Reddy for that. Id. at p. 25. The
City deposed Dr. Reddy in July of 2008.

Dr. Reddy testified, in response to concerns that firefighters
wear radios in the same area as the pacemaker:

A.   It would be theoretical, and the way to answer that would
     be to see the radio and run it and see if it interferes
     with the pacemaker.

Q.   So that would be bringing the physical
     equipment in here and looking at it and
     running her through some tests?

A.   Yes.

Q.   And they wear what are called full turnout--

A.   It's quite rare nowadays for external things
     to affect the function of pacemakers. It used
     to be you'd see signs saying "Microwave in
     Use."

. . .

     It used to be that pacemakers were not that
     good at excluding the noise that comes from
     electrical equipment, and they would therefore
     sometimes interpret noise from outside as
     coming from the heart and get confused.

     Pacemakers now are far less likely to be
     confused by external electrical interference,
     which is what the radio is. It's still in
     theory possible. It's an electronic device.
     It's possible that electronics can affect it.
     But it's quite unusual.... And testable.

Q.   What kinds of tests would you run to determine
     whether or not having a radio would be a
     problem or having her in what's called "full
     turnouts," which are SCBA gear which involve a

6 - ORDER

strap with compression over the chest? What kinds of tests would be run clinically to give her a full release?

A.   For the function of the pacemaker, I'd say we just need to put an EKG on her and record what her heart rhythm is when she has all the gear on and had the radio running in a way that would happen clinically and show that, with all this stuff going on, that the pacemaker paces her heart just the way it should otherwise and functions properly.

     For the physical aspect of it, you know, just to see when she puts it on, that's just another sort of looking to see what happens to her skin over the pacemaker when she has all the gear on, whether there are any abrasions, she has bruises from it.

Q.   And that's something that your clinic is capable of doing?

A.   We haven't done that, but we could do that.

Q.   And other concerns were that sometimes there were interferences at the Ali Plaza or other types of buildings that have antenna with microwaves. From what I understand you to say, that's no longer a concern with the current kind of pacemaker?

A.   No.

Q.   High frequency radio towers would not be a concern?

A.   High frequency radio towers - it would be hard to test for that. I have not seen any problems with any implanted devices related to high frequency towers personally. If electrical energy is high enough, you know, you can ultimately get to the point where it will interfere with pacemaker function.

Q.   Is there a certain amount of hertz or whatever is utilized to measure that?

A.   There is actually an exact field strength that
     they quote as being below that is safe and
     above that can cause interference.

Deposition of Dr. Reddy at pp. 32-35 (attached to Declaration

of Middleton (#31) at Ex. 12).

Dr. Reddy also testified about other concerns as follows:

Q.   One other question that came up recently: If
     she is using a sledgehammer or an axe and a
     lead would pop off, how would she be made
     aware of that?

A.   That's an issue in the first month or two of
     having the pacemaker. It takes a while for the
     lead to get fibrosed in the heart and get
     stuck in the heart. So if you do a lot of
     motion in the arm, you can kind of work it
     out. It's rare for that to happen after the
     first several months.

     It is observed to happen more often in people
     who do a lot of repetitive arm motions. For
     example, golfers are the classic ones that
     have lead longevity lower than the general
     population.

     She would notice that in routine follow-up for
     the pacemaker. Or if she had significant
     clinical improvement with the pacemaker - you
     know, her heart rate is faster now and because
     of that she feels a lot better - she might
     start feeling bad again because her heart is
     slow. All the pacemaker does is make the heart
     go faster.

Id. at pp. 35-36.

Dr. Reddy further explained plaintiff's symptoms and how the

pacemaker addressed them:

     ... best I can tell, she has gotten somewhat better.  It
     is not a cure for autonomic dysfunction.  It's not even
     always a cure for vagal syncope because there are other

things that cause people to pass out beyond a slow heart rate.

Your brain has a lot of tools to make you pass out if it wants to make you pass out, one of which is slowing your heart rate down. But other things make your blood vessels dilate so you get light-headed and dizzy and your blood pressure drops, you get nauseous, you get vomiting – you get all these other things that go on that a pacemaker does not fix.

So we take it with a lot of thought to decide to put a pacemaker into somebody who has vagal syncope or autonomic dysfunction or any of these types of syndromes. And some people just don't get better. They have a faster heart rate, and they just don't get better.

I think she has gotten better.

[As to prognosis,] [g]ood. Normal blood vessels, good activity and good functional ability. You know, with or without a pacemaker her prognosis is good from a cardiac perspective.

In terms of symptoms, much of her symptoms are not because of her heart function; so I can't say too much about that. Whatever symptoms she has that are primarily caused by nonphysiologic bradycardia should get better. Whatever symptoms she has that are not caused by that, time will tell.

Reddy Deposition at pp. 37-38 (attached to Declaration of Middleton (#31) at Ex. 12).

Dr. Abraham, after reading portions of the testimony, felt that Dr. Reddy's opinion was that testing would be of no further value in regards to pacemaker function, but he stated this opinion after testing was conducted. Ex. 24 (attached to Declaration of

Middleton (#31) at p. 2; Abraham deposition at p. 48 (attached to Declaration of Middleton (#31).[2]

The City's workers' compensation attorney also had a conversation with Dr. Reddy after the deposition, off the record, and recalls that Dr. Reddy was uncertain that the pacemaker would fully resolve plaintiff's symptoms and that Dr. Reddy recommended that plaintiff undergo the treadmill test and he communicated that to the City's Workers' compensation director, Jamie Iboa. Ronald Pomeroy Deposition (attached to Declaration of John Cathcart-Rake (#67) as exhibit 8) at pp. 56, 35-36, 58-59. Iboa states that counsel remarked that Dr. Reddy did not know that plaintiff's job was as strenuous as it is, and that had he known, he would have required the treadmill in full turn-outs. Iboa deposition (attached to (#67) as Ex. 7) at pp. 132-33; see also Ex. 205 to deposition (handwritten notes).

After the deposition, the City's Human Resources Director wrote to plaintiff to address her request to remain on light duty until September 1, 2008, and then return to the line as a firefighter/paramedic. Ex. 1 (attached to Declaration of Susan Marmaduke (#36) at pp. 47-48. The City informed plaintiff that it received information that Dr. Reddy is not comfortable with a return to full duties and that he would need to conduct further testing prior to giving a full release. The City further informed

---

[2]Dr. Abraham also stated that he hoped the City would not be asking him to second guess Dr. Reddy. Id. at Ex. 24 at p. 3.

plaintiff that it would schedule the treadmill test with Dr. Reddy.
After recommendations from Dr. Reddy and Dr. Abraham, the
department stated it would proceed with activities needed to
establish a return and hoped to accomplish this by November 21,
2008. The letter also informed plaintiff that while the issues
were being addressed, it will offer light duty work. The letter
specifically mentioned safety concerns to plaintiff and others.
Id.

On August 1, 2008, plaintiff took the test wearing her full
gear running at progressively faster speeds for as long as she
could. The pacemaker functioned properly with no interference
either at rest or with exercise. Dr. Reddy also noted that during
exercise, the pacemaker is passive.[3]    Ex. 12 (attached to
declaration of Middleton (#31). Because the technician neglected
to reset the pacemaker after setting it to 80 for purposes of the
test, plaintiff suffered anxiety, discomfort, difficulty sleeping,
etc. until the pacemaker was reset three days later.

The parties further deposed Dr. Reddy following the filing of
the complaint in this case. He testified that the purpose of the
test in full gear was to mimic as closely as possible the actual
circumstances of use and he further testified:

> So the reason for doing the test is the notion that in
> order to be a firefighter, you need to be tested more

---

[3]Plaintiff's heart rate elevates naturally in response to
exercise and thus the pacemaker does not need to act to bring her
heart rate up.

11 - ORDER

than somebody else out in the world, which is not a
peculiar notion. So somebody said we should be even more
sure that there's no interference with the pacemaker or
function when she is in all this gear. It's perfectly
reasonable to say, Okay, we'll see how she does with all
this gear.

That's not a -- that's not an ordinary medical test to
put people on a treadmill in firefighter gear. In fact,
you might be the only one that's ever had one done in our
office, but it's not terribly unusual to do, for example,
someone who works with arc welding equipment to go to
where they work, have a test of their EKG for the
pacemaker while they're arc welding, and say, okay, the
pacemaker's fine. You know, people request that not
infrequently, so it's not an unusual request.

. . . .

[Concern about the movement of the pacemaker] was brought
up when I saw the common gear they have to wear, and how
thin she is.

The other function of a pacemaker is it has an
accelerometer, which is a function where the pacemaker
changes what it considers the appropriate heart rate
based on what your activity is. [T]hat accelerometer is
also at times activated by pressure so the gear – if
she's very thin, which she is, and the gear actually got
the pacemaker to misinterpret her activity as being even
more activity than she was doing, then ... it would pace
her heart faster.

Reddy Deposition of February 8, 2011 (various excerpts attached to

Documents Numbered 31, 36, 67, 78, 81) at pp. 15, 27-28, 38.

Finally, Dr. Reddy testified:

Q.   So just so I'm clear, in terms of giving the
     basic release to work, you didn't feel that
     this testing was necessary for you to be able
     to do that. Right?

A.   I wouldn't have ordered it on a routine basis
     for somebody to go back to work with a
     pacemaker.

12 - ORDER

Q.    And you didn't order it for Carolyn before you gave her the June release. Right?

A.    Correct.

. . . .

Q.    ...Did you think it was reasonable to conduct the EKG test in full gear --

A.    Yeah.

Q.    `--On a treadmill? And so you never told anyone at the City, said, look, you know, there's no need for this test. Correct?

A.    No.

Reddy Deposition (attached to Marmaduke Declaration (#36) and Middleton Declarations (#58 and #78) at pp. 40-42.

Plaintiff contends that the requirement she undergo the treadmill test violated the disability statutes in question on medical examinations.[4]

The City of Eugene cannot

discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). This prohibition includes medical examinations and inquiries. 42 U.S.C. § 12112(d)(1). The City cannot

require a medical examination and shall not make inquiries of an employee as to whether such employee is

[4]The Rehabilitation Act and the Oregon law protecting people with disabilities incorporate the standards of the ADA. See 29 U.S.C. § 794(d), ORS § 659A.139(1).

13 - ORDER

an individual with a disability or as to the nature or
severity of the disability, unless such examination or
inquiry is shown to be job-related and consistent with
business necessity.

42 U.S.C. § 12112(d)(4)(A).

The business necessity standard is high and not to be confused
with mere expediency. Cripe v. City of San Jose, 261 F.3d 877, 890
(9th Cir. 2001). If the City encounters significant evidence that
would cause a reasonable person to question whether plaintiff is
still capable of performing her job such that there is genuine
reason to doubt whether plaintiff can perform job-related
functions, the standard is met. See Brownfield v. City of Yakima,
612 F.3d 1140, 1146 (9th Cir. 2010). In addition, where the City
believes plaintiff poses a direct threat due to her medical
condition, a determination

must be based on an individualized assessment of the
plaintiff's present ability to safely perform the
essential functions of the job, considering a reasonable
medical judgment relying on the most current medical
knowledge and/or best available objective evidence. ...
To determine whether an employee poses a direct threat,
the following factors should be considered: (1) the
duration of the risk; (2) the nature and severity of the
potential harm; (3) the likelihood that potential harm
will occur; and, (4) the imminence of the potential harm.

EEOC Enforcement Guidance: Disability-Related Inquiries and Medical
Examinations      of      Employees      Under      The      ADA
(http://www.eeoc.gov/policy/docs/guidance-inquiries.html) under the
heading JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY and note
39.)

"The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The direct threat exception was judicially created in School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n. 16 (1987). Congress later amended disability discrimination statutes to include the court's direct threat language. See Bragdon v. Abbott, 524 U.S. 624, 649 (1998). The ADA looks beyond whether the risk exists. The exception can only be invoked where a risk is significant. Id. The question is one of statistical likelihood. Id. at 652. Existence of a significant risk is determined by considering such factors as duration of the risk, nature and severity of the risk, likelihood of potential harm, and imminence of potential harm. 29 C.F.R. § 1630.2(r). These findings must be based on medical or other objective evidence. Bragdon, 524 U.S. at 649. A person with a disability must not be excluded based on stereotypes or fear and an employment decision may not be based on speculation about the risk to others. H.R.Rep. No. 101-485(III), at 45 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 468).

The evidence suggests that the City required the test both because of a concern that plaintiff was not capable of performing the job and because of threat to the safety of plaintiff and others. At this stage of the proceedings, it is not clear if defendant must meet the direct threat analysis. C.F. Doe v. An

15 - ORDER

Oregon Resort, Case number 98-6200, Findings of Facts and
Conclusions of Law (#153) (D.OR. May 11, 2001) at pp. 20-21
(business necessity defense may not necessarily require analysis of
a direct threat to others, but where defendant requires medical
exam solely because of perceived threat to others, then a direct
threat analysis is required).[5] Moreover, at this stage, even under
the direct threat analysis, the court declines to grant summary
judgment. There is evidence to suggest that the possibility of
interference or other reasons for pacemaker failure was only
theoretical and not significant enough to require any further
testing. There is also evidence to suggest that under the
strenuous conditions the City was most concerned about, the
pacemaker was not an issue regardless of interference. However,
the City did also want to test for issues while at rest and Dr.
Reddy stated that it was reasonable to conduct the test. Other
statements from Dr. Reddy may have been made that led the City to
believe he was uncertain that the pacemaker would fully resolve
plaintiff's symptoms. Dr. Reddy may have also told the City he did
not know that plaintiff's job was as strenuous as it is and that,

---

[5]In Bates v. United Parcel Service, Inc., 511 F.3d 974, 996
(9th Cir. 2007), the court applied the business necessity standard
to a safety-based qualification standard and noted that courts
should take into account the magnitude of possible harm as well as
the probability of occurrence. The higher the magnitude of harm,
the lower the needed probability. These factors somewhat mirror
the direct threat standards. The evidence at this stage does not
preclude a reasonable trier of fact from finding that Dr. Reddy's
statements demonstrated sufficient magnitude and probability
especially if the trier of fact accepts the alleged post-deposition
statements were made.

had he known, he would have required the treadmill test in full turn outs.[6]  Accordingly, plaintiff's motion for summary judgment is denied.

### Defendants' Motion for Summary Judgment (#33)

### A.  ADA,  Rehabilitation  Act,  and  ORS  § 659A  disability discrimination claims

As noted above, ADA standards are applicable to plaintiff's first three claims.  Defendant moves for summary judgment as to these claims asserting that the treadmill test and related inquires were job-related and consistent with business necessity.

There is an issue of fact as to whether the treadmill test was a reasonably effective method of achieving the City's goals of determining plaintiff's fitness for duty.  A trier of fact could conclude that the City unreasonably concluded the test was needed given the "theoretical" possibility of radio interference, the lack of impact of interference during exertion, Dr. Abraham's conclusion that the test was of no further value, and that the radio is not near the pacemaker during periods of rest, etc.  See Conroy v. New

---

[6]Plaintiff also cites evidence demonstrating that interference issues could have been tested by simply giving the radio to the pacemaker manufacturer to test directly and thus argues there was a reasonable accommodation that could have been made to avoid the medical test. However, Dr. Reddy did note issues with the accelerometer and pressure from the gear during actual use although the accelerometer issue would only make the heart go faster and not be life-threatening. He further stated that mimicking actual conditions as much as possible was desirable. Reddy Deposition at pp. 15-16, 40 (attached to Declaration of Cathcart-Rake (#67) as exhibit 4 and to Declaration of Middleton (#78)).

17 - ORDER

York State Dept. of Correctional Services, 333 F.3d 88, 97 (2d Cir. 2003):

> The employer must also show that the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary. The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal.

Defendants also contend that plaintiff suffered no injury as a result of the medical testing. Plaintiff need not show an adverse action in support of her claim regarding the medical testing under the ADA. Furthermore, there is evidence to suggest that plaintiff suffered physical harm from the test itself and tech errors. She asserts anxiety, discomfort, difficulty sleeping, etc. resulted. The motion for summary judgment on these claims is, therefore, denied.

## B. Gender Discrimination[7]

The City cannot fail or refuse to hire or discharge any individual, or otherwise discriminate against plaintiff with respect to her compensation, terms, conditions, or privileges of employment, because of her sex. 42 U.S.C. § 2000e-2(a)(1). Plaintiff contends that defendants' treatment of her, including the

---

[7]Again, the discrimination claims under Oregon and Federal law are treated the same. However, plaintiff agrees that her ORS § 659A.030 claims against defendants Fire Chief Randall Groves and Operations Chief Karen Brack individually should be dismissed under the Oregon Tort Claims Act.

medical exam, restrictions on her activities and job duties, return protocols, and shift assignment were adverse employment actions in violation of Title VII. To establish her claim, plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. Id. If the employer does so, the plaintiff must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

Defendant argues that they have taken no adverse employment action against plaintiff and that no similarly situated individuals were treated more favorably.

An adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of ... employment." Chuang v. University of California Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir. 2000). For instance, assigning more, or more burdensome, work responsibilities, is an

adverse employment action. <u>Davis v. Team Elec. Co.</u>, 520 F.3d 1080, 1089 (9th Cir. 2008).

Plaintiff asserts the following adverse employment actions: (1) the treadmill test; (2) return to duty regimen; (3) assignment to an undesirable shift; (4) exclusion from drilling and working out; and (5) removal of job duties.

As noted above, there is a question of fact as to whether the treadmill test was lawful. However, defendants note that plaintiff was not able to perform the essential functions of her job when the test was required by her own admission until September of 2008 and that the test did not affect the terms and conditions of her employment and that even male firefighters periodically undergo EKG testing. Although the test was subjectively unpleasant for plaintiff and may have caused some harm, there is no evidence to suggest she suffered any change in the terms or conditions of her employment given that she passed the test and returned to full duty in a time she had herself scheduled. She did suffer anxiety as to the return date because apparently she was not informed until the last minute, but her employment conditions were unaffected by the test itself.

There is an issue of fact with regard to the return to duty regimen. Defendants contend that she suffered no adverse employment action with respect to the protocols because she suffered no decrease in pay or benefits. However, there is

evidence to suggest that the protocols may have been more onerous than was required for male employees, including re-demonstration of skills associated with a new hire during a probationary period and that plaintiff may have lost opportunity for overtime pay as well.[8] While defendant contends that Scott Buckridge, a male firefighter, was subjected to the same tasks--he did have to complete them because he did not return to employment with the EFD. Thus, it is not clear if defendant would have treated male employees off work for that long the same.[9] Moreover, Firefighter Scott Olmos states that recruits do not even have to be observed on things like locating basic equipment or discussing the station computer. The issue of whether the return-to-duty protocols were materially adverse and not required for similarly situated male employees should be reserved to the trier of fact.

Plaintiff contends that the assignment to the C shift is adverse because it is the unit that responded to her when she collapsed and her heart stopped. She states that she is uncomfortable with the shift crew because they saw her naked, unconscious and at her most vulnerable. She also asserts they provided poor care. Because these allegations could lead a trier

---

[8]It should be noted that plaintiff did not allege lost overtime pay and did not assert it during discovery either. Nonetheless, the issue of the materiality of the return-to-work protocols themselves should be reserved to the trier of fact.

[9]Defendants also notes that Scott Hyder was similarly required to take a "high pressure" return-to-duty exam, but the return protocols were changed after that and thus different for plaintiff.

of fact to conclude that the shift change materially alters plaintiff's employment, the issue should be reserved for the jury especially since plaintiff informed defendants of her reluctance to be on that shift and the reasons for the reluctance.

There is an issue of fact as to whether defendants appropriately determined that plaintiff should be excluded from drilling and working out while on light duty given the June release from Dr. Reddy.    Nonetheless, defendants contend that such exclusion cannot constitute an adverse employment action.    Given the evidence that plaintiff needed to build upper body strength for a full return--the issue should go to a trier of fact as to whether this materially altered the privileges of employment given the importance of the workout facilities to the performance of plaintiff's work duties.

Finally, defendant does offer legitimate non-discriminatory reasons for plaintiffs removal of EMT duties while on light duty and after her full return stating that it could not afford to pay three people to do the EMT job while plaintiff was on light duty and plaintiff herself requested removal from direct patient care as paramedic as soon as possible upon her return to full duty. Nonetheless, summary judgment should be denied as to the gender discrimination claims for the reasons stated above.

## C.   Equal Protection

Plaintiff concedes that summary judgment is appropriate as to the City and individual defendants in their official capacities because the alleged unconstitutional acts were not the product of an official policy or custom.   Defendant also seeks summary judgment as to the individual defendants in their individual capacities because they are entitled to qualified immunity. However, it is clearly established that sex discrimination is prohibited and adverse alteration of job duties as a result is prohibited.   There is also an issue of fact as to whether Chief Groves reviewed or approved the return-to-work protocols.

## D.   Worker's Compensation Discrimination

Plaintiff asserts a claim for workers' compensation retaliation under ORS § 659A.040. To prevail, plaintiff must show: (1) that she invoked the workers' compensation system after she was injured; (2) that she was discriminated against in tenure, terms or conditions of employment; and (3) that defendants discriminated against her because she invoked the workers compensation system. Hardie v. Legacy Health System, 167 Or.App. 425, 433 (2000).   The burden shifting analysis of McDonnell Douglas applies to all claims brought under ORS § 659A. Snead v. Metropolitan Property & Casualty Insurance, 237 F.3d 1080, 1090-94 (9th Cir. 2001).

23 - ORDER

Defendant notes that virtually all firefighters file a workers' compensation claim at some time in their careers and thus it is implausible that it would discriminate against plaintiff for filing such a claim.   However, given that a trier of fact could conclude there were adverse employment actions and given the timing around the worker's compensation claim and the long battle over it, the claim survives summary judgment.   This is especially true given the counsel from the City's worker's compensation attorney and Dr. Abraham.

## CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment (#29) is denied and defendants' motion for summary judgment (#33) is granted in part and denied in part.

DATED this ___21st___ day of June, 2011.

_____
United States District Judge